UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
————————————————————————x

YARON AHISAR,

                    Plaintiff,

           v.

COMMISSIONER OF SOCIAL SECURITY,

                   Defendant.

————————————————————————x

**MEMORANDUM & ORDER**

14 CV 4134 (PKC)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Yaron Ahisar ("Ahisar" or "Plaintiff") commenced this action under 42 U.S.C. § 405(g), seeking judicial review of a "partially favorable" decision of the Defendant Commissioner of Social Security (the "Commissioner") granting Ahisar Social Security disability benefits beginning in July 2012, but denying benefits dating back to Ahisar's claimed earlier disability onset date of February 4, 2008. (Dkts. 1, 10−1.) The Commissioner moves for judgment on the pleadings, affirming her decision, and Ahisar cross-moves for judgment on the pleadings, reversing the Commissioner's decision and remanding for a new hearing and decision. (Dkts. 10, 12.) For the reasons set forth below, the Court GRANTS Ahisar's cross-motion, and DENIES the Commissioner's motion.

## *BACKGROUND*

### I.    Non-Medical Evidence

      Ahisar was born in 1950, and is a high school graduate. (Tr. 26, 121.)[1] From July 1992 to July 2005, he was the owner and operator of a trucking company. (Tr. 121.) Ahisar reported that he frequently lifted from 30 to 50 pounds in this job. (Tr. 141.) From January 2006 to

---

[1] All citations to "Tr." refer to the administrative record. (Dkt. 6.)

February 2008, Ahisar worked as a bookkeeper at a warehouse.  (Tr. 121, 139.)  He reported that

his duties at the warehouse were clerical in nature, involving "office duties, computer work,

general bookkeeping," and that he sat for six to seven hours, and lifted less than ten pounds.  (Tr.

140.)  Ahisar also testified that he sat for at most one to two hours at a time at the warehouse job,

recorded deliveries as they arrived, and sometimes delivered light packages weighing no more

than ten pounds to the Post Office or customers.  (Tr. 27−28, 36.)

Ahisar claimed that he stopped working in 2008 because of his impairments: pernicious

anemia[2] and peripheral neuropathy.[3]  (Tr. 24, 120−21.)  He also stated that he was laid off in

February 2008 because "business was bad" (Tr. 29, 33) and that he "developed symptoms . . .

after [he] was laid off" (Tr. 34).

In a function report dated September 11, 2011, Ahisar stated that he lived with his wife

and family in an apartment.  (Tr. 127, 138.)  He spent his day washing, dressing, praying,

socializing, and going to the grocery store.  (Tr. 128, 130−32.)  He sometimes walked and read.

(Tr. 128, 131.)  He went to the synagogue every day.  (Tr. 132.)  He sometimes cooked, but his

wife was primarily responsible for cooking and the housework.  (Tr. 129−30.)  Ahisar stated that

he had no problems tending to his personal care, taking his medication, or handling his financial

---

[2] "Pernicious anemia" is "a chronic progressive anemia of older adults . . . due to failure of absorption of vitamin B12, usually resulting from a defect of the stomach[.]"  *Stedman's Medical Dictionary* ("*Stedman's*"), available at Westlaw STEDMANS 36730.  It is "characterized by numbness and tingling, weakness, and a sore smooth tongue, as well as dyspnea after slight exertion, faintness, pallor of the skin and mucous membranes, anorexia, diarrhea, loss of weight, and fever."  *Id.*  "[A]dministration of vitamin B12 results in . . . relief from symptoms, . . . provided that pernicious anemia is not complicated by another disease[.]"  *Id.*  Dyspnea is shortness of breath or a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs.  *Id.* at 274360.

[3] The term "peripheral neuropathy" refers to a disorder affecting the peripheral nervous system.  *Stedman's* 601870.  Pernicious anemia may manifest itself in peripheral neuropathy in the form of damage to the nerves of the arms and legs.  *See* Healthline, *Pernicious Anemia*, http://www.healthline.com/health/pernicious-anemia#Symptoms3 (last visited Sept. 29, 2015).

affairs. (Tr. 128−29, 131). He said he went out every day alone and either walked, drove a car, rode in a car, or used public transportation. (Tr. 130.) Ahisar said he could not lift heavy loads, stand or sit for long periods of time, or walk as well as he used to. (Tr. 132−33.) He claimed that due to knee pain he could not kneel and that squatting was difficult. (Tr. 133.) Ahisar said he could walk for one hour before having to stop and rest for one-half hour. (Tr. 134.) He said he had problems paying attention, finishing what he started, and remembering, because he had "a lot of things on [his] mind[.]" (Tr. 134−35.) Ahisar also completed a pain questionnaire on September 11, 2011, in which he stated that beginning in 2004, he experienced back pain radiating to his legs when lifting heavy items, standing or sitting too long, or kneeling, which he relieved by changing position. (Tr. 135−38.) He did not undergo testing, treatment, or take pain medication for this condition. (Tr. 135−36.)

At the hearing held on February 20, 2013, Ahisar testified that he could not work due to muscle pain in his feet, right shoulder, both elbows, and back. (Tr. 29−30.) He explained that he felt heaviness in his feet and constant tingling in his back. (Tr. 30.) Ahisar also stated that he had stiffness in his neck and legs, had difficulty bending over, and that his whole body felt "uncomfortable." (Tr. 31, 34.) He was tired all of the time and needed to nap for a half-hour almost daily. (Tr. 32−33.) He could sit for one hour and stand for twenty minutes to a half-hour. (Tr. 32.) Ahistar testified that his symptoms had developed "three months, four, five, six months" after he had been laid off from his job in 2008. (Tr. 34.) Ahisar also testified that he was able to take care of his personal needs, use public transportation, and walk without a cane or walker. (Tr. 31−32.) He went to synagogue three times a day. (Tr. 31.)

## II.    Vocational Expert's Testimony

Melissa Fass Karlin, a vocational expert ("VE"), testified at the February 20, 2013 hearing before the Administrative Law Judge ("ALJ").  (Tr. 35−40, *see* Tr. 165−66.)  The VE testified that bookkeeping is categorized in the Department of Labor's Dictionary of Occupational Titles as sedentary in exertion.  (Tr. 35−36.)[4]  Based on Ahisar's testimony regarding his duties, however, the VE concluded that Ahisar's past work was more accurately categorized as that of "a shipping and receiving clerk," which is classified as medium in exertion.  (*Id.*)  But, because Ahisar testified that he lifted a maximum of only ten pounds, the VE characterized Ahisar's job as a performed at the light exertional level.  (Tr. 36−37.)[5]  The VE added that as a shipping and receiving clerk, Ahisar had acquired clerical skills such as recordkeeping that were transferable to the following semiskilled sedentary jobs with little vocational adjustment: order clerk (DOT Code 249.362−026), of which there are 2,510 jobs locally and 75,718 jobs nationally; and credit authorizer (DOT Code 249.367−022), of which there are 1,164 jobs locally and 31, 290 jobs nationally.  (Tr. 37−39.)

The ALJ noted that if Ahisar had obtained no transferable skills and was limited to sedentary work, he would be considered disabled under the Medical−Vocational Guidelines.  (Tr. 39.)  The ALJ also posed a hypothetical to the VE of an individual of Plaintiff's age, education, and work experience, who could do either a full range of light work or sedentary work

---

[4] Under 20 C.F.R. § 404.1567(a), sedentary work "involves lifting no more than 10 pounds . . . and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary . . . .  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."

[5] 20 C.F.R. § 404.1567(b) defines light work as "involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  . . .  [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."

with transferable skills, but would be expected to miss more than one day per month of work due to interference from his neuropathy symptoms. (Tr. 40.) The VE stated there would be no work for such an individual. (*Id.*)

### III.  Medical Evidence

Ahisar reported that he has been visiting Menahem Friedman, M.D. ("Friedman"),[6] his primary care physician, since 2005. (Tr. 123.)  He reported that he had undergone a neuromuscular examination and motor nerve conduction study (NCS) with "Dr. M. Charney" on January 18, 2008. (Tr. 124.)  In addition, Ahisar stated that he was referred to "Dr. Wolintz" for an MRI to evaluate his neurological functioning in December 2007 and January 2008. (Tr. 125.)

The record includes treatment notes from Ahisar's examination with Dr. Friedman on April 23, 2009. (Tr. 189−90.)  Ahisar was taking B−12 injections. (Tr. 189.)  Upon physical examination, Dr. Friedman noted that Ahisar was "in no apparent distress" and that his lungs, heart, abdomen, extremities, musculoskeletal system, and neurological system were normal. (Tr. 189−90.)  Dr. Friedman ordered blood testing. (Tr. 190; *see* Tr. 186−88.)  An ultrasound of Ahisar's thyroid performed on April 30, 2009 revealed a slightly enlarged thyroid but no abnormal masses. (Tr. 167.)  Ankle x-rays also taken on April 30, 2009 revealed no evidence of fracture or other bone or joint abnormality. (Tr. 168.)

On May 4, 2009, Dr. Friedman examined Ahisar and noted that Ahisar was under no apparent distress. (Tr. 184.)  The rest of his examination was normal. (Tr. 184−85.)

At another examination with Dr. Friedman on June 2, 2010, Ahisar complained of burning under his tongue and difficulty swallowing. (Tr. 176.)  The examination was otherwise

---

[6] Dr. Friedman is an internist.  WebMD, *Physician Directory − Dr. Mehahem Friedman, MD*, http://doctor.webmd.com/doctor/menahem-friedman-md-ae3d5256-8b24-4aa7-9e4e-9262eb8d 5767-overview (last visited Sept. 29, 2015).

normal.  (*Id.*)  Dr. Friedman referred Ahisar to an ear, nose, and throat specialist (ENT).  (Tr. 177.)

Simon H. Friedman, M.D., ("S. Friedman")[7] examined Ahisar on June 6, 2010 on a referral consultation from Dr. Friedman.  (Tr. 169; *see* Tr. 170.)  Ahisar complained of a burning sensation under the tongue radiating to the throat, intermittent hoarseness, mild dysphagia (difficulty swallowing), and some discomfort in the ears.  (Tr. 169.)  Examination revealed an area of ulceration on the right side of the mouth.  Dr. S. Friedman advised Ahisar to visit a dentist, as the ulceration may have been caused by irritation from Ahisar's dentures, and recommended a biopsy if the issue did not resolve.  (Tr. 170.)

Ahisar saw Dr. Friedman on November 1, 2010, to get a B−12 injection, and reported that he was feeling well.  (Tr. 182.)  Examinations of the skin, head, eyes, and the musculoskeletal and neurological systems were normal.  (*Id.*)  On November 2, 2010, due to an increase in blood pressure, Dr. Friedman advised Ahisar to lower his salt and caffeine intake and increase his exercise.  (Tr. 180−81.)  On March 3 and April 14, 2011, Ahisar saw Dr. Friedman for vitamin B−12 and to discuss "disability."  (Tr. 172−75.)  On September 15, 2011, Dr. Friedman administered a B−12 injection.  (Tr. 216−17.)  The examination indicated that Ahisar was in no apparent distress, and all examination findings were indicated as normal.  (Tr. 216.)

A fecal screening conducted on September 20, 2011, was positive for vimentin methylation, and Ahisar was advised to see a gastroenterologist for colorectal cancer screening.[8]

---

[7] Dr. S. Friedman is an otolaryngologist.  WebMD, *Physician Directory – Dr. Simon H. Friedman, MD,* http://doctor.webmd.com/doctor/simon-friedman-md-da24ddd1-9d0d-4772-ab34-490af2c54df6-overview (last visited Sept. 29, 2015).

[8] The fecal DNA test that screens for vimentin methylation is a diagnostic tool for detecting possible colorectal carcinomas.  *See* PubMed, *Vimentin methylation as a marker for advanced*

(Tr. 206.)  An abdominal and pelvic CT-scan performed on October 6, 2011 revealed no acute inflammation, no evidence of polyps or a discrete mass, linear opacity in the lingual of the lung consistent with linear/subsegmental atelectasis/post infectious/post inflammatory changes/scarring, and a moderate sliding hiatal hernia.  (Tr. 205.)

On October 10, 2011, Ahisar was consultatively examined by Jerome Caiti, M.D., on a referral from the Social Security Administration (or "agency").  (Tr. 191−94.)  Ahisar reported a history of neuropathy secondary to pernicious anemia of the peripheral nerves, and that he received B−12 injections every two weeks.  (Tr. 191.)  Ahisar stated that he was able to cook, clean, bathe, do laundry, shop, and care for children.  (*Id.*)

On physical examination, Ahisar appeared to be in no acute distress.  Dr. Caiti noted that Ahisar's gait was "minimally unsteady."  (*Id.*)  He walked on heels and toes with mild difficulty and complained of losing his balance.  Ahisar's squat was full while holding the table.  (*Id.*)  He used no assistive devices, and needed no help changing for the examination.  (Tr. 191−92.)  Ranges of motion in the cervical spine were full.  (Tr. 192.)  Dr. Caiti noted moderate kyphosis in Ahisar's thoracic spine.[9]  (*Id.*)  Ranges of motion in the lumbar spine elicited complaints of stiffness, and were limited as follows: flexion to 45 degrees; extension to 10 degrees; lateral flexion to 20 degrees; and rotation to 30 degrees.[10]  Ahisar's straight-leg-raising while seated

---

*colorectal carcinoma*, http://www.ncbi.nlm.nih.gov/pubmed/19331162 (last visited Sept. 29, 2015).

[9] Kyphosis is a forward rounding of the back.  *See* Mayo Clinic, *Kyphosis*, http://www.mayo clinic.org/diseases-conditions/kyphosis/basics/definition/con-20026732 (last visited Sept. 29, 2015).

[10] Average ranges of lumbar spine motion are as follows: flexion to 60 degrees and lateral flexion to 25 degrees.  American Medical Association, Guides to the Evaluation of Permanent Impairment, 128, 130 (4th ed. 1994).

was also limited to 60 degrees bilaterally.[11] Ahisar had full ranges of motion of the hips, knees, and ankles bilaterally. Joints were stable and nontender. (*Id.*) Pulses were physiologic and equal in the upper and lower extremities. (Tr. 193.) Dr. Caiti noted a sensory deficit in the legs, at 3−4/5 on a scale of 5. No muscle atrophy was evident. Grip strength was full bilaterally, and hand and finger dexterities were intact. (*Id.*)

Dr. Caiti diagnosed a history of pernicious anemia; history of peripheral neuropathy secondary to pernicious anemia; thoracic kyphosis; stiffness of the legs on straight-leg-raising, etiology unclear; and ventral hernia. (*Id.*) Dr. Caiti opined that Ahisar was unrestricted in his ability to stand, walk, and climb, and in reaching, pushing, and pulling. However, Dr. Caitri stated that Ahisar had a "moderate" limitation to bending and lifting due to peripheral neuropathy of the legs, thoracic kyphosis, stiffness in the legs, and ventral hernia. (*Id.*)

On November 17, 2011, Dr. Friedman administered a B−12 injection. (Tr. 215.) On March 29, 2012, Ahisar complained to Dr. Friedman of pain with prolonged sitting and standing, and that his hands were weak after prolonged work. (Tr. 213.) An examination indicated an antalgic (pain-avoiding) gait and decreased sensation in the lower extremities. (Tr. 213−14.)

Ahisar saw Dr. Friedman on July 23, 2012, and complained that his balance was worse. (Tr. 211−12.) Dr. Friedman diagnosed pernicious anemia neuropathy, and ordered balance therapy. (Tr. 212.) On that date, Dr. Friedman also completed a "Medical Assessment of Ability to do Work−Related Activities" form. (Tr. 199−201.) He opined that Ahisar could lift and/or carry less than ten pounds in an eight-hour workday due to peripheral neuropathy affecting his hand grip. (Tr. 199.) According to Dr. Friedman, Ahisar could stand and/or walk less than two hours in an eight-hour workday due to neuropathy in his feet affecting his balance, and could sit

---

[11] The straight leg raising test is used to detect nerve root compression or impingement. *Stedman's* 908450.

less than six hours due to joint stiffness in his back from prolonged sitting. (Tr. 200.) Dr. Friedman further opined that Ahisar was limited in pushing/pulling in the upper and lower extremities due to neuropathy. (*Id.*)

Ahisar saw Dr. Friedman on December 23, 2012, and complained of experiencing chest pain after walking two to three blocks. (Tr. 209−10.) Examination findings were normal, and included normal gait and station, and sensory testing. (Tr. 210.)

Dr. Friedman referred Ahisar to Paul K. Wein, M.D. for a stress test due to Ahisar's complaints of chest discomfort with activity. (Tr. 202−04.)[12] The test was conducted on December 26, 2012, and revealed positive stress EKG. (Tr. 202.) Dr. Wein also examined Ahisar, who denied having any musculoskeletal stiffness, pain or joint swelling. (Tr. 203). His balance was normal. Ahisar reported no limb weakness, abnormal sensation, or trembling. (*Id.*) Cardiovascular examination revealed regular rate and rhythm. (Tr. 204.) Ahisar's extremities evidenced no clubbing, cyanosis or edema. Dr. Wein diagnosed angina pectoris, coronary artery disease, and pernicious anemia. Based on the result of the stress test, he recommended cardiac catheterization, and prescribed Lopressor, aspirin, and Lipitor. (*Id.*)

Ahisar saw Dr. Friedman on January 15, 2013, for a blood pressure check, which was found to be stable. (Tr. 207−08.)

## *STANDARDS OF REVIEW*

### I.     <u>District Court Review of the Administrative Decision</u>

In reviewing a final decision of the Commissioner, the Court's duty is to determine whether it is based upon correct legal standards and principles and whether it is supported by substantial evidence in the record, taken as a whole. *See Talavera v. Astrue*, 697 F.3d 145, 151

---

[12] Dr. Wein is a cardiologist. *See* Vitals, *Dr. Paul K. Wein MD*, http://www.vitals.com/doctors/Dr_Paul_Wein.html (last visited Sept. 29, 2015).

(2d Cir. 2012) (the Court "is limited to determining whether the [Social Security Administration's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard"). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (alterations and internal quotation marks omitted). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (citations omitted). However, the Court is mindful that "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). Under any circumstances, if there is substantial evidence in the record to support the Commissioner's findings as to any fact, they are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013).

## II.      Disability Under the Social Security Act

The Social Security Act ("the Act") provides that an individual is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify for Social Security disability benefits, the claimed disability must result "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 1382c(a)(3)(D); *accord Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).

The Act's regulations prescribe a five−step process for the evaluation of disability claims. First, the Commissioner determines whether the claimant currently is engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i) (2015).

If the claimant is not currently engaged in "substantial gainful activity," the Commissioner proceeds to the second step, which is whether the claimant suffers from a medical impairment, or combination of impairments, that is "severe," meaning that the impairment "significantly limits [claimant's] physical or mental ability to do basic work activities." If the impairment is not severe, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii), (c).

If the impairment is severe, the Commissioner proceeds to the third step, which is whether the impairment meets or equals one of the impairments listed in Appendix 1 to Subpart P of Part 404 of the Act's regulations. If so, the claimant is presumed disabled and entitled to benefits. 20 C.F.R. § 404.1520(a)(4)(iii).

If the impairment does not meet or equal a listing in Appendix 1, the Commissioner proceeds to the fourth step, which is whether, despite the claimant's severe impairment, he has the "residual functional capacity" ("RFC") to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). A claimant's RFC is used to assess whether he or she can perform one of the five categories of work recognized by Social Security Administration regulations (listed here in order of decreasing rigor): very heavy, heavy, medium, light and sedentary. 20 C.F.R. § 404.1567(a). Sedentary is the least rigorous of the five categories. *Schaal v. Apfel*, 134 F.3d 496, 501 n. 6 (2d Cir. 1998) (citing 20 C.F.R. § 404.1567). In determining a claimant's RFC, the Commissioner considers all medically determinable impairments, even those that are not "severe." 20 C.F.R. § 404.1545(a). If the claimant's RFC is such that s/he can still perform past work, the claimant is not disabled.

If the claimant cannot perform past work, the Commissioner proceeds to the fifth and final inquiry, which is whether, in light of the claimant's RFC, age, education, and work experience, the claimant has the capacity to perform other substantial gainful work which exists in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant has such capacity, the claimant is not disabled. If not, the claimant is disabled and entitled to benefits. *Id.*

The claimant bears the burden of proving her case at steps one through four; at step five, the burden shifts to the Commissioner to establish that there is substantial gainful work in the national economy that the claimant could perform. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

## DISCUSSION

### I.     The ALJ's Decision

On June 13, 2011, Ahisar filed an application for disability insurance benefits alleging disability beginning February 4, 2008, due to pernicious anemia and peripheral neuropathy. (Tr. 109−10, 117, 120.) After the application was denied (Tr. 42, 49, 53), Ahisar requested a hearing by an ALJ (Tr. 56, 59−60). He appeared with his attorney on February 20, 2013, before ALJ Mark Solomon. (Tr. 21−41.)

ALJ Solomon issued a "partially favorable" decision on March 29, 2013, in which he found that Ahisar was not disabled from the alleged onset date of February 4, 2008, but became disabled on the date of Dr. Friedman's July 2012 medical source statement. (Tr. 7−17.)[13] As an initial matter, the ALJ concluded that Ahisar had not engaged in substantially gainful activity since February 4, 2008, the alleged disability onset date. (Tr. 13.) At steps two and three, the ALJ found that Ahisar's pernicious anemia and neuropathy were severe impairments, but that

---

[13] The ALJ's written decision mistakenly indicated the date of the July 23, 2012 statement as July 13, 2012. (*Compare* Tr. 201 *with* Tr. 14).

they did not, either singly or in combination, meet or equal any of the listed, presumptively disabling impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ then determined that prior to July 13, 2012, Ahisar had the RFC to perform the full range of light work as defined in 20 C.F.R. § 404.1567(b), rejecting as not fully credible Ahisar's statements about the intensity, persistence, and limiting effects of his symptoms. (Tr. 14−15.) Applying this RFC finding at step four, the ALJ found that prior to July 13, 2012, Ahisar was able to return to his past relevant work as a shipping clerk because that work, as actually performed at the light level, did not require the performance of work−related activities precluded by his RFC. (Tr. 15.) Alternatively, the ALJ found that based on the VE's testimony, Ahisar had transferable skills to specific sedentary jobs with little vocational adjustment, including that of an order clerk and a credit authorizer. (Tr. 16.) Thus, the ALJ concluded that Ahisar was not disabled prior to July 13, 2012. (*Id.*)

With respect to the period beginning July 13, 2012, the ALJ determined that Ahisar retained the RFC to perform light work, but would be expected to miss more than one day per month of work due to his neuropathy and anemia. (Tr. 15.) This conclusion was based on Dr. Friedman's medical source statement, dated July 23, 2012, and on a finding that there was "no prior documentation of any greater limitation in the record." (*Id.*) The ALJ also found Ahisar's allegations regarding his symptoms and limitations beginning July 2012 to be generally credible. (*Id.*) The ALJ proceeded to step four of the sequential evaluation and found that beginning July 13, 2012, Ahisar's RFC precluded him from returning to his past relevant work. (Tr. 16.) Continuing on to step five and, considering Ahisar's vocational factors and the testimony of the vocational expert, concluded that as of July 13, 2012, there was no work in the national economy

that Ahisar could perform.  (*Id.*)  Therefore, the ALJ concluded that Ahisar was disabled under the Act as of July 13, 2012, through the date of the decision.  (Tr. 16−17.)

The ALJ's decision became a final determination of the agency on June 21, 2014, when the Social Security Appeals Council denied Ahisar's request for review.  (Tr. 1−3, 6.)  This action followed.

## II.     The ALJ Erred in Failing to Develop the Record Regarding Ahisar's Disability Onset Date

Ahisar seeks review of the portion of the ALJ's decision that concludes Ahisar was not disabled prior to July 13, 2012.  (Dkt. 10−1 at 1.)[14]  Thus, the core of the parties' dispute is whether the ALJ correctly set Ahisar's disability onset date to July 13, 2012, rather than Ahisar's claimed onset date of February 4, 2008.  Ahisar contends that insofar as the ALJ relied on the date of Dr. Friedman's medical source statement, the ALJ erred in failing to seek clarification from Dr. Friedman regarding the disability onset date.  (*Id.* at 7.)  Additionally, Ahisar asserts that the ALJ's determination regarding the onset of his disability is unsupported by substantial evidence revealing a long history of impairment.  (*Id.*)  While the Court declines to fix the onset date as February 4, 2008, because the existing medical evidence is insufficient to support Ahisar's claimed onset date, it nonetheless agrees with Ahisar that remand is necessary to augment the record on this issue.

Social Security Ruling ("SSR") 83–20 establishes guidelines for determining the onset date of disability.  Titles II & XVI: Onset of Disability, SSR 83−20, 1983 WL 31249 (S.S.A. 1983); *see also* 20 C.F.R. § 402.35(b)91) (Social Security Rulings "are binding on all components of the Social Security Administration"); *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984) (Social Security Rulings are binding on all Social Security Administration decision-

---

[14] Docket citations refer to internal pagination rather than those assigned by the ECF system.

makers). "[I]t is essential that the onset date be correctly established and supported by the evidence." SSR 83–20, 1983 WL 31249, at *1. "The starting point in determining the date of disability onset" is the claimant's statement. *Id.* That date "should be used if it is consistent with all the evidence available." *Id.* at *3; *see Corbett v. Comm'r of Soc. Sec.*, 08 CV 1248, 2009 WL 5216954, at *13 (N.D.N.Y. Dec. 30, 2009) ("As a general rule, a claimant's allegation regarding the date of onset must be accepted provided it is consistent with medical evidence in the record."). In addition, the "day the impairment caused the individual to stop work is frequently of great significance" in determining an onset date. S.S.R. 83–20, 1983 WL 31249, at *2. Although SSR 83−20 recognizes that "medical evidence serves as the primary element in the onset determination," it also acknowledges that "[w]ith slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling." *Id.* In such circumstances, it is "necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process." *Id.*

"Where the ALJ determines that the date of onset is other than what the claimant alleges, the ALJ has an affirmative obligation to 'adduce substantial evidence to support his [finding].'" *Corbett*, 2009 WL 5216954, at *13 (quoting *Moses v. Sullivan*, 91 CV 6980, 1993 WL 26766, at *4 (S.D.N.Y. Jan. 19, 1993)) (alteration in *Corbett*). Any onset date inference, however, "must be . . . based on the facts and can never be inconsistent with the medical evidence of record." S.S.R. 83–20, 1983 WL 31249, at *3. When there is no objective medical evidence from the period surrounding a claimant's alleged onset date, the disability onset date chosen by the ALJ must be the product of an "informed judgment" and be supported by a "legitimate medical basis." *Id.* An arbitrary onset date selection will not be accepted by a reviewing court:

> [C]ourts have held tha[t] an ALJ may not rely on the first date of diagnosis as the onset date simply because an earlier diagnosis date is unavailable. Similar results obtain where an ALJ adopts some other equally arbitrary onset date, such as the date on which the claimant applied for SSI benefits, received a consultative examination, or appeared before an ALJ at an administrative hearing.

*McCall v. Astrue*, 05 CV 2042, 2008 WL 5378121, at *18 (S.D.N.Y. Dec. 23, 2008) (internal citations and footnote omitted); *accord Cataneo v. Astrue*, 11 CV 2671, 2013 WL 1122626, at *15−16 (E.D.N.Y. Mar. 17, 2013).

If the ALJ reasonably questions the alleged onset date, "the best practice may be to solicit the views of a medical expert." *Monette v. Astrue*, 269 F. App'x 109, 112 (2d Cir. 2008). While SSR 83–20 does not mandate that an advisor be called in all cases, *see* 1983 WL 31249, at *3, "[c]ourts have found it 'essential' for the [ALJ] to consult a medical advisor" where the "claimant does not have contemporaneous medical evidence from the period around his alleged disability onset date; the record is ambiguous with respect to onset date; and claimant's disability onset date must therefore be inferred[.]" *Cataneo*, 2013 WL 1122626, at *16 (citing cases); *see Hamilton v. Astrue*, 11 CV 954, 2012 WL 5303338, at *2 (N.D.N.Y. Oct. 25, 2012). The ALJ's failure to adhere to the guidelines set forth in SSR 83–20 when determining a claimant's disability onset date constitutes grounds for remand when the ALJ's determination of disability onset date is not otherwise supported by substantial evidence. *Cataneo*, 2013 WL 1122626, at *17; *Telfair v. Astrue*, 04 CV 2122, 2007 WL 1522616, at *7−8 (S.D.N.Y. May 15, 2007).

In this case, the record contains no contemporaneous medical evidence from the period surrounding Ahisar's claimed onset date on February 2008. Ahisar's alleged onset date coincides with the date he ceased working, on February 4, 2008, and he testified that he

developed symptoms shortly thereafter.  (Tr. 29, 33−34.)[15]  Indeed, the earliest medical evidence included in the administrative record is from Dr. Friedman's April 2009 treating notes.  (Tr. 189−90.)  Citing to the absence of "prior documentation of any greater limitations in the record," the ALJ concluded that Ahisar was disabled as of the date of Dr. Friedman's July 2012 medical statement.  (Tr. 15.)  Further, the ALJ found that Ahisar's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms [were] not entirely credible prior to July 13, 2012."  (*Id.*)  Thus, the ALJ rejected Ahisar's claimed disability onset date based on the lack of evidence to support this onset date and perceived inconsistencies in the record evidence.

In light of the absence of contemporaneous medical records from 2008 and the ambiguous medical proof, the ALJ should have called on the services of a medical advisor to assist in inferring the onset date of Ahisar's disability.  *See Cataneo*, 2013 WL 1122626, at *17 (finding that ALJ was required to seek the advice of a medical expert to help determine date of disability onset where the ALJ "determined that the record lacked objective contemporaneous medical evidence and that the non-medical evidence was ambiguous, not credible, and contradictory with respect to disability onset date"); *Stokes v. Comm'r of Soc. Sec.*, 10 CV 0278, 2012 WL 1067660, at *13 (E.D.N.Y. Mar. 29, 2012) (holding that, due to limited medical evidence and a conflict between claimant's alleged onset date and other circumstantial evidence, the ALJ on remand was obligated to consult a medical expert to determine onset date); *Dhanraj v. Barnhart*, 04 CV 5537, 2006 WL 1148105, at *6 (S.D.N.Y. May 1, 2006) (remanding, in part,

---

[15] That Ahisar indicated he was laid off because "business was bad" (Tr. 29, 33) is not necessarily inconsistent with his claim that his disabling impairment arose around that time.  *See McCall*, 2008 WL 5378121, at *20−21 (noting that continued employment is not conclusive to the disability determination, since an ALJ must consider how well the claimant is performing in his employment).

because ALJ failed to hire a "medical advisor to assist him" in determining the disability onset date as required by SSR 83−20).

The administrative record requires further development regarding the disability onset date in other respects. *See Stokes*, 2012 WL 1067660, at *13 (noting that "SSR 83–20 imposes what might fairly be called heightened record-development duties") (citations and internal quotation marks omitted). As the Commissioner acknowledges in his reply brief (Dkt. 14 at 3), Dr. Friedman's medical source statement did not specify whether his stated opinions were retrospective in nature. (Tr. 199−201.) At the very least, then, the Court agrees with Ahisar that the ALJ should have sought clarification from Dr. Friedman regarding the onset of the limitations described in his July 2012 statement. Furthermore, the record suggests that medical evidence is available surrounding Ahisar's claimed February 2008 onset date: Ahisar reported that he began visiting Dr. Friedman as early as 2005 (Tr. 123), and that he underwent a neuromuscular examination and motor nerve conduction study with Dr. M. Charney on January 18, 2009 (Tr. 124), and an MRI to evaluate his neurological functioning with Dr. Wolintz around December 2007 and January 2008 (Tr. 125). Yet there is no indication that the ALJ sought to obtain these medical records.

Moreover, remand is warranted because the ALJ's selection of July 13, 2012 as the disability onset date is not supported by substantial evidence. The record suggests that well before July 2012, Ahisar had a history of pernicious anemia that required monitoring and vitamin B−12 injections, that he developed peripheral neuropathy secondary to the pernicious anemia, and that his condition progressively deteriorated. The earliest medical evidence in the record are Dr. Friedman's examination notes from April 23, 2009. (Tr. 189−90.) At that examination, Ahisar was already receiving B−12 injections to address his pernicious anemia. (Tr. 189). Dr.

Friedman's notes indicate that he discussed "disability" with Ahisar in March and April 2011. (Tr. 172, 175.) On October 10, 2011, the agency's consulting examiner, Dr. Caiti, reported a restricted range of motion in the lumbar spine, moderate kyphosis in the thoracic spine, leg stiffness, and moderate limitation on bending and lifting. (Tr. 192.) Dr. Caiti further observed a minimally unsteady gait, mild difficulty walking on heels and toes, and that Ahisar complained of losing his balance. (Tr. 191.) In March 2012, Dr. Friedman noted that Ahisar presented pain from prolonged sitting and standing, weakness in his hands after prolonged work, an antalgic gait, and decreased sensation in Ahisar's lower extremities. (Tr. 213−14). Hence, Dr. Friedman's examinations, which are entitled to significant weight under the treating physician rule, and Dr. Caiti's report, suggest that Ahisar may have been disabled before July 2012. It is thus at least reasonable to conclude that the disability began earlier than Dr. Friedman's July 2012 diagnosis of pernicious neuropathy, recommendation of balance therapy, and medical source statement. (Tr. 212); *see Moses*, 1993 WL 26766, at *4 (finding that the date of physician's medical report does not necessarily coincide with the disability began onset date, and could reasonably suggest that the disability began earlier).

In short, because the medical record is incomplete and the available evidence suggests progressive deterioration in Ahisar's pernicious anemia and neuropathy symptoms before July 2012, the ALJ's finding that Ahisar was disabled as of the date of the medical source statement is not supported by substantial evidence. *See Cataneo*, 2013 WL 1122626, at *19 ("The Commissioner's failure to adhere to the guidelines set forth in SSR 83–20 warrants remand when his determination is not otherwise supported by substantial evidence.").[16]

---

[16] Relatedly, insofar as the ALJ found Ahisar's allegations regarding his symptoms and limitations to not be "entirely credible" prior to the ALJ's selected disability onset date in July 2012, but "generally credible" beginning in July 2012, that finding is similarly unsupported by

## III. The ALJ Failed to Comply with the Treating Physician Rule

The Court further finds that, upon remand, a reassessment of Ahisar's RFC may be necessary.[17] In his motion, Ahisar argues that while the ALJ accorded "due deference" to Dr. Friedman's findings as a treating physician, the ALJ erred in concluding that Dr. Friedman's findings were consistent with a capacity for either light work or sedentary work with skills transferred from his past relevant work. (Dkt. 10−1 at 7.) The Court concludes instead, however, that the ALJ failed to properly apply the treating physician rule and that this failure impacted the ALJ's analysis of Ahisar's RFC.

The treating physician rule "generally requires deference to the medical opinion of a claimant's treating physician[.]" *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *see* 20 C.F.R. § 404.1527(c)(1) ("Generally, [the Commissioner] give[s] more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."). According to Social Security Administration regulations, the Commissioner will give "controlling weight" to "a treating source's opinion on the issue(s) of the nature and severity of . . . impairment(s) [so long as the opinion] is well−supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in

---

substantial evidence. (Tr. 14, 15.) The ALJ is therefore instructed to reassess Ahisar's credibility with reference to the factors listed in 20 C.F.R. § 404.1529(c)(3)(i)–(vii), after supplementation of the record. As part of its assessment, the ALJ should consider Ahisar's long work history. *See Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983) ("[a] claimant with a good work record is entitled to substantial credibility when claiming inability to work"); *see Fernandez v. Astrue*, 11 CV 3986, 2013 WL 1291284 at *20 (E.D.N.Y. Mar. 28, 2013) (finding the plaintiff was entitled to substantial credibility based on a 25-year work history).

[17] Of course, reassessment of Ahisar's RFC would be obviated by any determination on remand that the disability onset date coincided with Ahisar's alleged onset date, as such a finding would result in a grant of benefits for the entire period of disability claimed by Ahisar. The Court includes this discussion, however, for the sake of completeness and in the interest of conserving administrative and judicial resources.

the record.  20 C.F.R. § 404.1527(c)(2).  "An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion."  *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2), now codified at 20 C.F.R. § 404.1527(c)(2)).  In any event, the Commissioner must "give good reasons in [its] notice of determination or decision for the weight give[n] [claimant's] treating source's opinion."  20 C.F.R. § 404.1527(c)(2).

The preference for a treating physician's opinion is generally justified because "[such] sources are likely to be [from] the medical professionals most able to provide a detailed, longitudinal picture of [the Plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations."  20 C.F.R. § 404.1527(c)(2). By the same token, the opinion of a consultative physician, "who only examined a Plaintiff once, should not be accorded the same weight as the opinion of [a] Plaintiff's treating [physician]."  *Anderson v. Astrue*, 07 CV 4969, 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009) (citing *Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 282–83 (E.D.N.Y.2005)).  "This is because 'consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.'" *Id.* (quoting *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)).  In addition, opinions of consulting physicians are entitled to relatively little weight where there is strong evidence of disability on the record, or in cases in which the consultant did not have a complete record.  *Correale–Englehart v. Astrue*, 687 F. Supp. 2d 396, 427 (S.D.N.Y. 2010).

Consistent with the ALJ's duty to develop the administrative record, an ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the

administrative record." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (citing *Schaal*, 134 F.3d at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte.")). Thus, "if a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion." *Correale–Englehart*, 687 F. Supp. 2d at 428.

Here, in concluding Ahisar had the RFC to perform light work prior to July 2012, the ALJ accorded only "partial weight" to the findings of Dr. Friedman, who had treated Ahisar regularly over the course of several years, beginning three years before Ahisar's claimed onset date, and instead assigned "substantial weight" on the opinion of the agency's consulting physician, Dr. Caiti, based on a single examination of Ahisar she performed on October 10, 2011. (Tr. 14.) The ALJ found that Dr. Friedman's conclusions regarding Ahisar's limitations were "not corroborated by his treating notes," which "provide[d] very little information about claimant's condition." (*Id.*) However, insofar as the ALJ found Dr. Friedman's opinion deficient for lack of details regarding Ahisar's condition, or corroborating medical evidence, the ALJ was required to supplement the record. *See* 20 C.F.R. § 404.1512(d); *Correale–Englehart*, 687 F.Supp.2d at 428; *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269−70 (S.D.N.Y. 2010). Because Ahisar had been visiting Dr. Friedman since 2005 (Tr. 123), details regarding Ahisar's treatment history with Dr. Friedman were critical in assessing how Ahisar's limitations affected his RFC for the claimed period of disability. The need to seek supplementation is of particular importance here because, as previously discussed, medical records surrounding Ahisar's alleged

disability onset date of February 4, 2008 are missing from the administrative record, including records from two physicians referenced in Ahisar's disability report. (Tr. 124−25).

The Commissioner contends that the ALJ was under no duty to supplement the record or recontact Dr. Friedman since there were no obvious gaps in the record and the available evidence was consistent and adequate to make a disability determination. (Dkt. 14 at 2.) These arguments are belied by the ALJ's reasoning, which cites to missing information about Ahisar's conditions in Dr. Friedman's notes (Tr. 14), and the incomplete medical history considered by the ALJ. Furthermore, as discussed in the previous section, the medical evidence in the record was at least inconsistent, thus necessitating an attempt to clarify or reconcile. Accordingly, remand is appropriate to allow the ALJ to supplement the medical evidence regarding Ahisar's impairments during the entire period of claimed disability.

On remand, the ALJ may request a more detailed report from Dr. Friedman describing Ahisar's condition, the specific relevant medical evidence that supports his opinions regarding Ahisar's limitations, and the onset date of Ahisar's limitations. After appropriate supplementation of the record, the ALJ should determine whether the opinions of Ahisar's treating physician or physicians deserve controlling weight, and if applicable, articulate reasons for according less than controlling weight to these opinions.

The ALJ should additionally reassess Plaintiff's credibility with reference to the factors listed in 20 C.F.R. § 404.1529(c)(3)(i)–(vii). To the extent the ALJ discredited Plaintiff's statements concerning his pain or the intensity, persistence and limiting effects of his impairments, the ALJ should indicate how he assessed and balanced the various factors. After reassessing Ahisar's credibility, the ALJ should then evaluate Ahisar's RFC and explain the bases for his RFC finding.

Finally, the Court notes that its decision to remand this matter does not reflect any view or opinion that a complete development of the record, as described herein, will ultimately support Ahisar's claimed disability onset date. Indeed, the ALJ's rejection of that date was neither irrational nor entirely lacking in evidentiary support. However, the Act's review process demands that such decisions be based on a scrupulous and thorough examination of all relevant and properly considered medical and other evidence and opinions, and be supported by substantial evidence. Thus, it is simply for the purpose of ensuring full compliance with the Act's procedures and standards that the Court orders remand.

## *CONCLUSION*

For the reasons set forth above, the Court DENIES the Commissioner's motion for judgment on the pleadings and GRANTS Ahisar's cross-motion. The Commissioner's decision is remanded for further consideration and new findings consistent with this Memorandum & Order. The Clerk of Court is respectfully requested to close this case.

SO ORDERED:


 /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: September 29, 2015
       Brooklyn, New York